Max Kaplan v. Commissioner.
Kaplan v. Commissioner
Docket No. 33920.
United States Tax Court
1953 Tax Ct. Memo LEXIS 412; 12 T.C.M. (CCH) 4; T.C.M. (RIA) 53009; January 8, 1954
*412 Held: Petitioner, his wife and his three sons, acting with a business purpose, in good faith, intended, at the time of the formation of a partnership, to join together with others in the present conduct of a business enterprise. Samuel Hecht, Esq., for the petitioner. John J. Madden, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the petitioner's income taxes for the years 1945 and 1946 in the amounts of $139,187.58 and $42,742.66, respectively. The sole question presented is whether the petitioner is taxable upon 50 per cent of the income of a partnership during the years in question or whether the petitioner's wife and three sons were bona fide members of the partnership. Findings of Fact The facts stipulated are found accordingly. Max Kaplan, the petitioner, resides in Brooklyn, New York and filed his income tax returns for the years in question with the Collector of Internal Revenue for the Second District of New York. The partnership of Kaplan Bros. was originally organized in 1900 by the petitioner and his brother Jacob Kaplan as equal partners. This partnership was engaged *413 in manufacturing, importing and selling artificial flowers. Its products were sold at wholesale to chain stores, millinery and apparel manufacturers, gift shops, department stores and display firms. The petitioner's father and mother had been engaged in the same business prior to 1900. The petitioner actively participated in the business since its formation. About 1928 the petitioner suffered a fractured skull in an automobile accident which impaired his senses and affected his memory. Since 1917 Jacob Kaplan devoted his time to a cotton goods business which was liquidated in 1940. The partnership employed between 500 and 1100 persons during most of the period from 1930 to 1944 and approximately 500 workers in the years in question. The petitioner had three sons Harold, Eugene and Seymour Kaplan. The sons worked in the business to some extent during their school years and during vacations. Harold Kaplan, hereinafter sometimes referred to as Harold, worked in the shipping, coloring, and pressing departments of the firm. Seymour Kaplan, hereinafter sometimes referred to as Seymour, worked as a shipping clerk and prepared bills and bills of lading. He also worked in the material production *414 department and assisted in the flower-making processes. Eugene Kaplan, hereinafter sometimes referred to as Eugene, worked in the shipping and glass departments and also with the salesmen. The petitioner's son Seymour majored in chemistry in college at his father's suggestion that such training would prove useful in the business. In 1943 he entered the armed services. Eugene graduated from medical school and soon after completing his internship in 1941 entered the armed services as a medical officer. Harold became an attorney and entered the practice of law in 1931. In 1937 the petitioner requested Harold to leave the practice of law and enter the petitioner's business, promising him a partnership interest at some future time. Harold gave up his practice and has worked for the firm of Kaplan Bros. full time since 1937. Prior to 1944, Harold worked in the printing operations, supervising that activity. He also determined production costs and aided in the development of a mail order business. Harold also undertook the task of complying with governmental regulations relating to home work, wage-hour laws, wage stabilization and war production. Prior to 1938, the petitioner's wife, Eva, *415 hereinafter sometimes referred to as Eva, did not participate in the business. In that year the petitioner's only daughter died and Eva was advised by her physician to occupy herself away from home. She became active in the partnership in 1938, working full time. She learned to make flowers, kept the production records of employees and assisted the employees of the firm, 75 per cent of whom were females. Eva Kaplan received a salary of $15 per week for her services. Prior to 1943, the petitioner, who wished to have his sons help him with the business in his later years and carry on the business after his death, sought his brother's permission to take his family into the business as partners, without success. Upon the recommendation of the petitioner's bank in 1943, the petitioner discussed with his brother the problems that would arise upon the death of either partner. Jacob Kaplan suggested that the petitioner purchase his interest. Jacob Kaplan's daughters objected to this sale but it was agreed that both partners would take their families into the partnership. In January 1944, the petitioner, by deed of assignment, made a gift to his wife and each of his three sons of a 20 per *416 cent interest of his 50 per cent interest in the partnership. Jacob Kaplan similarly made a gift of 25 per cent of his 50 per cent interest in the partnership to each of his three daughters. Proper gift tax returns were filed by the parties. Seymour and Eugene received the proposed partnership agreement while in the Service. Seymour designated his father as his attorney in fact and Eugene designated his mother as such. On March 28, 1944, Harold, Eugene, Seymour, Eva and Max Kaplan, together with Jacob Kaplan and his three daughters, entered into a partnership agreement agreeing to conduct the business under the name of Kaplan Bros. The agreement was executed by Eugene and Seymour under the powers of attorney granted by them to their parents. The agreed upon net worth of the partnership was $137,621.92, as of January 1, 1944. The capital contributions were fixed at the following percentages: Jacob Kaplan
12 1/2
Max Kaplan
10
Eva Kaplan
10
Harold Kaplan
10
Eugene Kaplan
10
Seymour Kaplan
10
Naomi Bergstein
12 1/2
Sylvia Gladstone
12 1/2
Beulah Meer
12 1/2
The agreement also provided: * * *
"SIXTH: * * * "The capital accounts of the respective *417 partners is not to be impaired below the original contributed capital, by withdrawals, excepting that as it always has been the custom heretofore between Max Kaplan and Jacob M. Kaplan for the firm to pay the federal and state income taxes on the amounts credited to each partner, this practice is to be continued with respect to the parties to this agreement. "No interest is to be paid or accrued to partners on any excess capital. * * *
"EIGHTH: All of the moneys of the partnership and all instruments for the payment of money to the partnership shall, when received, be deposited in the bank account or bank accounts of the partnership. All checks, drafts and instruments of indebtedness of the partnership shall be drawn on the following signature arrangements: (a) The individual signature of either Max Kaplan or Jacob M. Kaplan or (b) the signature of any one of three partners Naomi Bergstein, Beulah Meer or Sylvia Gladstone countersigned by Harold Kaplan. * * *
"ELEVENTH: All purchases, all rents, expenses for repairs or improvements, all taxes, all business insurance premiums, salaries and wages and all other operating expenses of the partnership which may be incurred *418 in connection with the carrying on of the business of the partnership shall be paid out of the receipts and earnings of the said business. "The profits and/or losses of each year shall be divided in the following order: "(a) The sum of Sixteen Thousand Nine Hundred and 00/100 ($16,900) Dollars thereof shall be divided between the following three partners by each receiving weekly the following sum, to wit: MAX KAPLAN
$200.00
EVA KAPLAN
25.00
HAROLD KAPLAN
100.00
to be carried as part of the expense account before determining the individual shares of profits and losses. "(b) The balance of the net profits, after payment as provided for in subdivision (a), shall be divided among the parties hereto as follows: JACOB M. KAPLAN
12 1/2%
MAX KAPLAN
10%
EVA KAPLAN
10%
NAOMI BERGSTEIN
12 1/2%
SYLVIA GLADSTONE
12 1/2%
BEULAH MEER
12 1/2%
EUGENE S. KAPLAN
10%
SEYMOUR F. KAPLAN
10%
HAROLD KAPLAN
10%
"(c) Any loss which the partnership may suffer shall be borne by the parties in the same proportion as above mentioned for profits in subdivision (b). "(d) No interest is to be paid or allowed to partners on undrawn profits or on excess *419 capital. * * *
"THIRTEENTH: * * * "(b) The parties now agree that MAX KAPLAN shall be managing and executive partner of the firm, and in this capacity he shall have all necessary authority to conduct the business of the firm and do all things necessary and usual on the part of a managing and executive partner in a business partnership. * * *
"FIFTEENTH: In the event of the death of any of the parties, the partnership shall not thereby be terminated, but the partnership shall automatically continue uninterrupted and the procedure shall be as follows: "(a) In the event of the demise of MAX KAPLAN, his share shall be distributed in accordance with the instructions of his Last Will and Testament, but disposition shall be limited only to any or all of the following: - EVA KAPLAN, HAROLD KAPLAN, EUGENE S. KAPLAN and SEYMOUR F. KAPLAN; "(b) In the event of the demise of EVA KAPLAN, her share shall be distributed in accordance with the instructions of her Last Will and Testament, but disposition shall be limited only to any or all of the following: MAX KAPLAN, HAROLD KAPLAN, EUGENE S. KAPLAN and SEYMOUR F. KAPLAN; "(c) In the event of the demise of JACOB M. KAPLAN, the *420 share of the decedent shall automatically be acquired by NAOMI BERGSTEIN, SYLVIA GLADSTONE and BEULAH MEER in equal shares, it being the intention that NAOMI BERGSTEIN, SYLVIA GLADSTONE and BEULAH MEER, on the death of JACOB M. KAPLAN, be entitled to, in the aggregate, a fifty (50%) per cent interest in said partnership, provided that they allow the equity of such decedent to remain as part of the capital investment; "(d) Upon the demise of MAX KAPLAN and/or EVA KAPLAN, then HAROLD KAPLAN, EUGENE S. KAPLAN and SEYMOUR F. KAPLAN shall with the survivor, if any, as the case may be, in like manner, be entitled to an aggregate of fifty (50%) per cent interest in the partnership, provided that they allow the equity of such decedent to remain as part of the capital investment. * * *
"EIGHTEENTH: If any disagreement shall arise between or among the parties in respect to the conduct of the business of the partnership, or to its dissolution, or in respect of any other matters, cause or thing whatsoever not herein otherwise provided for, the same shall be submitted to arbitration pursuant to and in accordance with the rules of the American Arbitration Association. * * *
"TWENTIETH: *421 In the event any of the partners desires to sell his, her or their interest in the partnership, it must first be offered to the group from which said partner originally obtained his, her or their interest, and said group, collectively or otherwise, shall have sixty (60) days within which to accept the offer of sale. The purchase price thereof shall be determined as provided in paragraph "SIXTEENTH" hereof. In the event the group does not exercise an acceptance of the offer of sale, then the partner offering said interest for sale, shall then offer the same to the other partners of the company. "TWENTY-FIRST: It is agreed that in no event and at no time and for no reason whatsoever, good or otherwise, shall any of the parties hereto or his, her or their personal representatives, have the right to bring an action for the dissolution of the partnership and/or to have a receiver appointed of its assets and/or to restrain any of the other partners from doing any act with respect to the partnership assets or business; excepting that any of the partners may serve upon the others written notice, sent by registered mail to the last-known address of each of the other partners and giving at *422 least sixty (60) days' notice, of his or her desire to discontinue the business at the end of the then current season; in which event the remaining partners shall automatically be vested with the right to acquire the interest of such partner or partners so giving notice, in the same manner as previously mentioned in paragraphs "SIXTEENTH" and "TWENTIETH". The foregoing provision, however, shall not deprive any of the parties to this agreement of the right to require the other partners to account for any and all of their acts with respect to this partnership." There was credited to the capital account of the petitioner, as of January 1, 1944, the amount of $13,762.20 and the amount of $13,762.19 to the respective capital accounts of Eva, Harold, Eugene and Seymour. Eva continued her services to the firm following the partnership agreement. She continued to keep production records, aided in personnel matters, purchased samples of artificial flowers made by competitors and helped with displays and sales. She underwent an operation in 1945 and did not work for 2 1/2 months. She suffered a similar disablement in 1948. Following the partnership agreements, salaries were paid of $200 *423 weekly to the petitioner; $100 to Harold and $25 weekly to Eva. During the years in question Harold continued his activity with regard to the firm's compliance with government regulations, supervised all home work activity and the acquisition of raw materials requiring governmental permission with respect to steel wire, paper and cotton. In 1946, the respondent made adjustments in the income of the partners for 1944. Jacob Kaplan's three daughters were rejected as partners and he was charged with 50 per cent of the partnership income. The petitioner's salary was increased to $15,000 annually under these adjustments. Harold's salary was increased to $7,500 yearly and Eva's annual wages were increased to $3,500. Eugene's distributive share was reduced to 5 per cent. The withdrawals of the partners from capital accounts were as follows: Max Kaplan
Year
Amount
1944
$10,648.78
1945
15,880.00
1946
15,691.41
Harold Kaplan
1944
$ 6,230.00
1945
10,680.00
1946
6,841.89
Eugene Kaplan
1944
$ 1,000.00
1945
5,480.00
1946
1,505.80
Eva Kaplan
1944
$ 2,300.00
1945
6,780.00
1946
5,413.80
Seymour Kaplan
1944
$ 1,000.00
1945
5,760.00
1946
6,625.20
*424 As stated on the income tax returns, the distributive share of each of the partners was as follows for the years in question: 1945
Max Kaplan
$49,993.25
Eva Kaplan
40,893.25
Harold Kaplan
44,793.25
Eugene Kaplan
39,593.25
Seymour Kaplan
39,873.25
1946
Max Kaplan
$25,876.45
Eva Kaplan
16,776.45
Harold Kaplan
20,676.44
Eugene Kaplan
15,476.44
Seymour Kaplan
15,476.44
Upon his return from military service in October 1945, Seymour began full time duty with the partnership and has continued in this activity until the present time. While in service as a medical officer, Eugene Kaplan, after discussions with his brother Harold, investigated the possibility of opening a branch factory in Puerto Rico and a factory was opened there by the firm in 1946. Harold went to Puerto Rico to set up the plant. Flowers were produced there from the raw materials and then returned to New York. Harold and Seymour supervised all transactions between the Puerto Rican plant and New York. Harold made several trips to Puerto Rico yearly and Seymour was left in charge of the New York operations. Eugene returned to New York following his discharge from the service and *425 entered residency at Queens General Hospital. In June 1945, the partners were informed by their landlord that the firm would have to vacate its premises. Harold, Seymour and Eugene sought a new building for the location of their New York factory. A building was agreed upon and purchased for $475,000. Jacob Kaplan, Harold and the petitioner made loans to the firm totaling $100,000 to help meet the purchase price. The building was purchased in the names of all the partners in March 1946. Harold acquired an extension of time to move from the landlord of the old building which was needed to make necessary repairs on the new building. Harold and Seymour laid out the new factory, showrooms and offices, and supervised the movement of machinery, equipment and merchandise to the building. In 1945, Seymour undertook the duty of taking inventories and established a system of perpetual inventory records. Seymour supervised the direct mail advertising of the firm. Harold, Seymour and the petitioner conferred daily, discussing mail and correspondence, including bills, cancellations, sales and other matters and the procedure to be followed with respect thereto. Seymour supervised the firm's participation *426 in merchandise shows and the layout of the firm's catalogue. Loans were made to the firm by the petitioner and Harold Kaplan during the years in question and by other members of the family in later years. In January 1948, the petitioner, his wife, and three sons purchased the interests in the firm of Jacob Kaplan and his three daughters. Petitioner, his wife Eva, and his sons, Harold, Eugene and Seymour Kaplan, each acting with a true business purpose and in good faith, formed (with others) a partnership for the present conduct of a business enterprise. Opinion VAN FOSSAN, Judge: The sole issue for determination is whether the members of the petitioner's family were bona fide partners in the firm of Kaplan Bros. The test of this issue is "* * * whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose *427 intended to join together in the present conduct of the enterprise * * *." . Tested by the above criteria and other well established precepts of the law, we are fully convinced that the four persons, Eva, the wife of petitioner, Harold, Eugene and Seymour, all sons of petitioner, joined with petitioner Max Kaplan and certain others in the formation of a partnership known as Kaplan Bros., all being motivated by a proper business purpose and all acting in complete good faith. We have so found in the above findings of fact. Here we have an interesting study of the patriarch of a family group, then in his declining years, and who has, through a long apprenticeship, shepherded his family along a road he has followed to financial success, determining to admit the four other members of his family to full and equal participation in the enterprise which he, with their help, has created. Each has had years of acquaintance and has entire familiarity with the business. Each has learned much by actual experience in the business and each has made valuable contributions of services to it. All are of mature age. In furtherance *428 of the commendable ambition to see his work live after him, after fully advising each of the others of his purpose and the considerations involved therein, and having their concurrence, petitioner determined to create a partnership in which there was to be equality of ownership among the five. He made gifts to each of the beneficiaries, namely, his wife and each of his sons of a 20 per cent interest in the share then owned by him, retaining an equal share for himself. There was no thought of tax evasion. It was a simple intimate family arrangement motivated by genuine good faith. A partnership agreement was drawn to carry on the business, each contributing the interest then possessed. This agreement satisfies the usual legal concepts of contribution of capital or services, sharing the profits and losses, and other familiar tests of such a business organization. Thereafter the business was so conducted by the partnership, additional capital was invested as earnings came to hand, valuable services were contributed by each and the business prospered. Little need be added to our finding above. The organization before us was a true partnership, the parties were genuine partners, and respondent *429 erred in not recognizing it as such. Decision will be entered under Rule 50.